UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>JOSE LUIS LOPEZ QUINTANILLA,<br>a/k/a Jose Luis Lopez,<br>a/k/a Jose Lopez,<br><br>    Defendant. | Case No: CR 09-01188 SBA<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR RECONSIDERATION AND DISMISSING INDICTMENT**<br><br>Docket 45 |

Defendant Jose Luis Lopez-Quintanilla ("Defendant") is charged in a one-count Indictment with a violation of 8 U.S.C. § 1326(a) and (b)—Deported Alien Found in the United States. The Court previously denied Defendant's Motion to Dismiss the Indictment. The parties are now before the Court on Defendant's Motion for Reconsideration of that ruling. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS the Motion for Reconsideration, for the reasons set forth below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Civ. L.R. 7-1(b); Crim. L.R. 2-1.

## I. BACKGROUND

### A. FACTUAL OVERVIEW

Defendant (DOB 12/10/1981) is unmarried and a citizen of El Salvador. Decl. of Jose Lopez-Quintanilla ("First Lopez Decl.") ¶ 2, Dkt. 24-1 Ex. 1. Defendant initially entered the United States without authorization in June 1990, when he was eight years old.

Id. Approximately four years later, on or about April 18, 1994, Defendant's father, a lawful permanent resident, filed a visa petition for his wife and their children, pursuant to § 203(a)(2) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1153(a)(2). Decl. of Mary E. Waltermire ("First Waltermire Decl.") at 4-5, Dkt 24-1 Ex. 3.[1] In December 1998, Defendant, along with his mother and brother, applied for an adjustment of status. Id. at 4. Defendant's mother and brother were approved for permanent resident status, but Defendant was not. Id. In a notice dated April 1, 2001, the United States Immigration and Customs Enforcement ("ICE") informed Defendant that his "application is considered abandoned and is hereby denied" because he did not submit requested documentation. Gov.'s First Opp'n Ex. A at 2, Dkt. 26. Although Defendant disputes that finding, there is no indication in the record that he challenged the denial of his application or reapplied to adjust his status.

Around the time ICE denied Defendant's application for permanent resident status, he was providing care for his two younger brothers while his mother worked twelve-hour night shifts. Decl. of Maria Ivette Quintanilla Lopez in Support of Mot. for Recons. ("Mother Decl.") ¶ 17, Dkt. 45-1 Ex. C. He assisted his brothers with their homework, ensured that they had dinner, and put them to bed. Id. Defendant, who speaks both Spanish and English, also served as his family's primary translator, and his parents generally relied on him to resolve issues with bills, household problems, medical appointments, and meetings with teachers. Id. ¶ 20. He was his father's "right-hand man" in various jobs and business ventures. Decl. of Jose Manuel Lopez Rodriguez in Support of Mot. for Recons. ("Father Decl.") ¶¶ 9-12, Dkt. 45-1 Ex. D. Defendant also provided

---

[1] According to Defendant's expert, an attorney specializing in immigration law, federal regulations provide that unmarried children who are under the age of twenty-one as of the date of filing are automatically included in a parent's visa petition and assigned the same "priority date," which is based on the date the application was originally submitted. First Waltermire Decl. at 4-5; see also 22 C.F.R. § 42.53(a). As of his priority date (April 18, 1994), Defendant was twelve years old and unmarried. Therefore, he was automatically included in the visa petition his father submitted on behalf of his mother. See 22 C.F.R. § 42.53(c); First Waltermire Decl. at 4.

financial support for his parents and brothers.  Id. ¶ 13; Mother Decl. ¶¶ 23-24.  Although he moved out of his parents' house in 2001, he maintained a close relationship with his family and continued assisting his parents.  Mother Decl. ¶¶ 6, 18, 35.

On January 18, 2002, Defendant's son, Caleb, was born.  First Leavitt Decl. ¶ 3, Dkt. 27-1 Ex. B.  When Caleb was approximately three months old, Defendant became his primary caregiver.  Mother Decl. ¶ 11.  According to Defendant, Caleb required "a lot" of medical care, due to "bronchial problems."  Id. ¶ 5.  He also had trouble digesting his formula.  Decl. of Jose Luis Lopez Quintanilla in support of Mot. for Recons. ("Second Lopez Decl.") ¶ 4, Dkt. 45-1 Ex. E.  Caleb "frequently got sick" and "had to be rushed to the emergency room several times[.]"  First Lopez Decl. ¶ 5.  Between March 26, 2002 and January 13, 2003, Caleb was seen by the Hayward Pediatric Group eight times for his respiratory issues.  Id. ¶ 10; Def.'s First Reply Ex. C (letter from Hayward Pediatric Group).

In October 2002, Defendant was convicted in Alameda County Superior Court of willful infliction of corporal injury on a spouse, a violation of California Penal Code § 273.5(a), and sentenced to three years imprisonment.  First Lopez Decl. ¶ 4.  According to Defendant, he had been paying rent on behalf of the victim (apparently his girlfriend or fiancée) and otherwise supporting both her and her children.  Def.'s Mot. to Dismiss ("Mot. to Dismiss"), Ex. A, Dkt. 24-1.  They had an argument, at which point Defendant told her that he was no longer willing to pay her rent and then left.  Id.  Allegedly out of spite, the girlfriend filed a report indicating that he raped and assaulted her.[2]  Id.  After the preliminary hearing, the lack of evidentiary support for the charges became apparent, and the prosecutor offered to drop the rape and oral copulation charges if Defendant would agree to plead guilty to the domestic violence charge.  Id.  Defendant claims he accepted the plea agreement because he otherwise faced a thirty-two year sentence.  Id.

---

[2] The girlfriend previously had made the same type of accusation against her ex-husband.  Def.'s First. Mot. Ex. A.

After Defendant's incarceration, the girlfriend—who was also Caleb's mother—took custody of Caleb. Mother Decl. ¶ 11. But she became overwhelmed raising Caleb and her four other children, and she asked Defendant's parents to take him six months later. Id. Defendant's parents agreed to take custody of Caleb, and they have been caring for him since 2003. Id. Raising Caleb has proven difficult. Because both grandparents work full-time, they have had difficulty arranging for childcare, and consequently, the grandmother had to reduce her work schedule to watch Caleb. Id. ¶ 13, 24. In addition, the grandparents experienced significant challenges arising from Caleb's physical and mental health issues. In particular, Caleb's upper respiratory condition required regular use of a medical apparatus. Id. ¶ 28. Around this time period, Caleb also began showing signs of hyperactivity. Id. ¶ 15. He was later diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), and he now sees a psychologist on a regular basis. Id. Caleb's hyperactivity and respiratory problems existed at the time of Defendant's deportation proceedings, and the grandparents would have been able testify at that time regarding the hardship that resulted from Defendant's then-anticipated deportation. Id.

## B. PROCEEDINGS BEFORE THE IMMIGRATION JUDGE

On March 1, 2004, Defendant appeared before an Immigration Judge ("IJ") in San Diego, California. First Lopez Decl. ¶ 5. The IJ advised Defendant that there were two charges pending against him, one involving a crime of moral turpitude and the other alleging entry into the United States without inspection. First Packel Decl. ¶ 4, Dkt. 24-1 Ex. 2. During the course of the hearing, Defendant informed the IJ that—until the time of his arrest—he was employed and providing support for his son, his fiancée, and her four children. Id. ¶¶ 5, 7. He indicated that he had been doing so for a number of years. Id.

When Defendant asked the IJ whether he had any chance of avoiding deportation, she responded, "You don't." Id. ¶ 6. The IJ then stated, "There's only one application you can make. In order to make that application, you would have to prove that it's more likely than not that if you were to return to El Salvador that the Salvadoran government would torture you for some reason." Id. ¶ 8. The IJ told Defendant that if he were able to prove

this, he would be eligible for a deferral of deportation, "[b]ut only until the government changes." Id. Defendant then attempted to explain the circumstances surrounding his prior conviction. Id. ¶ 9. The IJ explained that, while she could consider such information in some circumstances, she was foreclosed from doing so in his case because he was convicted of a crime of violence and sentenced to a term of imprisonment for three years. Id. The IJ reiterated that "there's nothing that [she] could do for [him]." Id.

After stating that she had reviewed with Defendant "all the reasons" why he did not have relief available to him, the IJ asked Defendant whether he had "any reason to think that the Salvadoran government would harm [him] in any way if [he] had to go back there?" Id. ¶¶ 13-14. Defendant responded, "To be honest, I don't know. But I mean . . . From here I got east Los Angeles on my back, you know? I mean, this is my country so I don't know." Id. The IJ noted that El Salvador had gang problems, to which Defendant responded that he was not a gang member. Id. ¶ 14. In turn, the IJ told Defendant, "So long as you go there and don't cause any problems for anybody there probably won't be any problems for you." Id. The IJ then entered her order of deportation, which Defendant accepted. Id. ¶ 15. Defendant was deported to El Salvador later in March 2004. First Lopez Decl. ¶ 2.

Defendant and his parents decided that it was in Caleb's best interests that he not join his father in El Salvador. Mother Decl. ¶ 12; Second Lopez Decl. ¶ 6. Caleb's bronchial problems required ongoing medical treatment in the United States. Id. Further, they concluded that El Salvador was too violent and dangerous for Caleb to live there. Id. Underscoring the violence in El Salvador, Defendant notes that he had to cancel Caleb's scheduled trip to visit him in El Salvador after getting shot at on his way to work. Second Lopez Decl. ¶ 7. Defendant alleges that he was subject to similar episodes of violence throughout the two years he remained in El Salvador, and he alleges that he returned to the United States because he learned Salvadoran gang members were "after [him]." Id. ¶¶ 17-18.

### C. CURRENT PROCEEDINGS

On or about October 2, 2009, Defendant was found in the United States. Indictment at 2, Dkt. 1. The Government filed an Indictment against Defendant on December 17, 2009, charging him with illegal reentry following deportation under 8 U.S.C. § 1326. Id. at 1-2. Defendant filed a Motion to Dismiss the Indictment under § 1326(d), arguing that his 2004 deportation order was unlawful and thus cannot serve as the predicate to a charge of unlawful reentry. Def.'s Mot. at 6-8. Specifically, Defendant argued that the IJ failed to advise him that he could avoid deportation by obtaining a waiver of inadmissibility under section 212(h) of the INA (a "§ 212(h) waiver"), 8 U.S.C. § 1182(h). Id. at 8. In addition, the IJ allegedly misinformed Defendant about the requirements for protection under the Convention Against Torture ("CAT"), 8 C.F.R. § 1208.16. Id.

A defendant charged with illegal reentry may seek dismissal of the charge by collaterally attacking the prior removal order. 8 U.S.C. § 1326(d); see also United States v. Mendoza-Lopez, 481 U.S. 828, 837-39 (1987). To sustain a challenge to a prior deportation order in a § 1326(d) action, the defendant must, within constitutional limitations, demonstrate (1) that he exhausted all administrative remedies available to him to appeal his removal order, (2) that the underlying removal proceeding at which the order was issued improperly deprived him of the opportunity for judicial review, and (3) that the entry of the order was fundamentally unfair. See 8 U.S.C § 1326(d); United States v. Ramos, 623 F.3d 672, 680 (9th Cir. 2010). At issue here is whether Defendant's 2004 removal order was fundamentally unfair. "An underlying removal order is fundamentally unfair if an alien's due process rights were violated by defects in the underlying deportation proceeding, and if he suffered prejudice as a result of the defects." Ramos, 623 F.3d at 680 (internal quotation marks omitted).

On November 30, 2010, the Court issued a written Order denying Defendant's Motion to Dismiss. United States v. Quintanilla, No. CR 09-01188 SBA, 2010 WL 4922686 (N.D. Cal. Nov. 30, 2010), Dkt. 34. The Court found that the IJ violated Defendant's due process rights both by failing to advise him about § 212(h) waivers and by

misstating the requirements for protection under CAT.  Id., at *4, 8.  However, the Court also found that Defendant failed to show prejudice by establishing a plausible basis for relief under either § 212(h) or CAT.  Id., at *7, 9.  Defendant's § 212(h) claim lacked a "clear, detailed demonstration" that he provided familial support beyond mere financial support.  Id., at *6 (quoting United States v. Becerril-Lopez, 541 F.3d 881, 886 (9th Cir. 2008)).  His CAT claim failed to show any particularized threat of torture.  Id., at *9.

Defendant has now filed a Motion for Reconsideration of the Court's prior Order denying his Motion to Dismiss.  Def.'s Mot. for Recons. ("Mot. for Recons."), Dkt. 45.  He makes two general arguments.  First, he contends that the Court failed to consider material facts and dispositive legal arguments that were before it when it issued its prior Order.  Id. at 4, 8.  Second, he proffers material facts that were not before the Court when it denied his motion to dismiss.  Id. at 10.  According to Defendant, the newly-submitted evidence details the non-financial support that he provided to his parents and illustrates the evidence of extreme hardship that he could have presented in support of his application for a § 212(h) waiver.

As set forth below, the Court finds that it properly denied Defendant's motion based on the arguments and evidence presented in connection with the motion.  Nonetheless, in the interests of justice and judicial economy, the Court now considers Defendant's newly-presented evidence as it relates to the issue of prejudice and finds that dismissal of the Indictment is warranted.

## II. <u>LEGAL STANDARD</u>

A district court has the discretion to reconsider its prior orders.  Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993).  Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if

there is an intervening change in controlling law." Id.; Civ. L.R. 7-9(b).[3]  Aside from these factors, a district court also has inherent authority to reconsider an interlocutory decision to prevent clear error or prevent manifest injustice.  Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988); c.f. United States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997) (recognizing that district courts have discretion to depart from law of the case and reconsider a prior ruling, inter alia, based on substantially different evidence, changed circumstances or to avoid manifest injustice).

## III.  DISCUSSION

### A.  FAILURE TO CONSIDER MATERIAL FACTS AND ARGUMENTS

Defendant contends the Court manifestly failed to consider three material facts in its prior Order:  (1) the expert declaration of Mary Waltermire; (2) the fact that Defendant would be deported to El Salvador; and (3) the possibility of extreme hardship to Defendant's parents.  Mot. for Recons. at 4-8.  Defendant further contends the Court failed to consider certain of his legal arguments.  Id. at 8-10.  None of these contentions is compelling.

First, Defendant contends the Court failed to consider Mary Waltermire's expert opinions, including her opinion that the level of violence and poverty in El Salvador made it more likely that a § 212(h) waiver would have been granted had he applied for one.  Mot. for Recons. at 4-6.  Despite Defendant's claims to the contrary, the Court did not disregard Ms. Waltermire's declaration.  See, e.g., Quintanilla, 2010 WL 4922686, at *1 n.1, *5 n.4.  Moreover, while Ninth Circuit dicta suggests an expert's testimony may be considered in ascertaining whether there was a reasonable probability that a waiver would have been granted, see United States v. Arrieta, 224 F.3d 1076, 1083 (9th Cir. 2000), the Court ultimately concluded that Defendant had failed to make the requisite "clear, detailed demonstration" of non-economic familial support that the Ninth Circuit requires,

---

[3] Under Criminal Local Rule 2-1, the Civil Local Rules apply to criminal cases except where inconsistent with the Criminal Local Rules, the Federal Rules of Criminal Procedure, or federal criminal law.  None of these sources conflict with Civil Local Rule 7-9(b).

Quintanilla, 2010 WL 4922686, at *6-7 (quoting Becerril-Lopez, 541 F.3d at 886). See also United States v. Muro-Inclan, 249 F.3d 1180, 1186 n.4 (9th Cir. 2001) ("The attorney's expert opinion, although entitled to some weight, is not independently sufficient to overcome the otherwise insufficient showing of plausible extreme hardship.").

Second, Defendant argues that the Court did not take into account the fact that he was to be deported to El Salvador—as opposed to another country, such as a Mexico—which allegedly made it more likely that a § 212(h) waiver would have been granted. Mot. at 6. This argument also is unpersuasive. The Court, in fact, acknowledged that Defendant was to be deported to El Salvador. See Quintanilla, 2010 WL 4922686, at *8-9. But Defendant did not argue, as he does now, that the violence and poverty in El Salvador rendered it more likely that he would have been granted a § 212(h) waiver. See Mot. to Dismiss at 11-14.

Third, Defendant contends the Court failed to consider the possibility of extreme hardship to his parents, and instead, looked solely to the hardship to Caleb. Mot. for Recons. at 7-8. The Court's prior ruling focused on Caleb because Defendant failed to support his motion to dismiss with declarations from either of his parents regarding any claim of hardship. Id. at 7. Rather, Defendant relied entirely on his expert's testimony, which failed to establish clearly and with detail that Defendant provided non-economic familial support to his parents. See Becerril-Lopez, 541 F.3d at 886; Muro-Inclan, 249 F.3d at 1186 n.4.

Finally, Defendant contends that the Court manifestly failed to consider the dispositive legal argument that a showing of extreme hardship could be based on the disruption of Defendant's family unity. Mot. for Recons. at 8-10. Contrary to Defendant's assertion, the Court addressed his family unity argument in its prior Order, but ultimately concluded that his contention was not supported adequately. See Quintanilla, 2010 WL 4922686, at *7.

In sum, the Court rejects Defendant's contention that reconsideration is warranted on the grounds that the Court manifestly failed to consider material facts and arguments in its

prior ruling. Based on its review of the prior motion and the record presented in support thereof, the Court finds that its decision to deny Defendant's motion to dismiss was proper. The Court therefore considers whether the supplemental declarations proffered by Defendant warrant reconsideration.

### B. NEWLY-PRESENTED EVIDENCE

#### 1. Threshold Issues

As an alternative matter, Defendant contends that reconsideration is supported by new material facts—in the form of declarations submitted by Defendant, his parents, his attorney, and his expert witness—that were not previously presented to the Court when it issued its prior Order. See Mot. for Recons. at 10-15 & Exs. A-E-2. The Government contends the new evidence that Defendant presents was available to him at the time he filed his motion to dismiss, and therefore, the evidence is not "newly-discovered." Gov.'s Opp'n at 4, Dkt. 48. Generally, evidence is newly-discovered if it could not have been discovered with "reasonable diligence" prior to the district court's ruling. See Caliber One Indem. Co. v. Wade Cook Financial Corp., 491 F.3d 1079, 1085 (9th Cir. 2007).

Here, counsel for Defendant does not dispute she could have obtained declarations from the Defendant's parents earlier. Counsel nonetheless asserts that she did not "appreciate" that such facts would be "compelling" until she discussed them with Defendant's expert witness after the Court issued its prior Order. Mot. for Recons. at 15; Decl. of Joyce Leavitt in Support of Mot. for Recons. ("Second Leavitt Decl.") ¶¶ 4-6. The Court is not persuaded by counsel's claim of reasonable diligence. If counsel's showing were sufficient, a party would be able to seek reconsideration in every case where he or she failed to make a sufficient evidentiary proffer in support of the motion from which reconsideration is being sought.

The Court's determination that Defendant's evidentiary proffer is not "newly-discovered" does not foreclose it from exercising its discretion and reconsidering its prior ruling. "All rulings of a trial court are 'subject to revision at any time before the entry of judgment.'" United States v. Houser, 804 F.2d 565, 567 (9th Cir. 1986) (quoting Fed. R.

Civ. P. 54(b)); see also Abada v. Charles Schwab & Co., 127 F. Supp. 2d 1101, 1102 (S.D. Cal. 2001) (stating that a court has the discretion to reconsider and modify an "interlocutory decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of controlling law."). The Court's Local Rules must be construed "to promote the just, efficient, speedy, and economical determination of every action and proceeding." Civ. L.R. 1-2(b). As noted by counsel for Defendant, a finding that she was not diligent, coupled with the Court's refusal to consider Defendant's newly-presented evidence, could give rise to a claim for ineffective assistance of counsel ("IAC"). See Strickland v. Washington, 466 U.S. 668, 687 (1984) (holding that ineffective assistance is established if the defendant can demonstrate: (1) "that counsel's performance was deficient," and (2) that "the deficient performance prejudiced the defense."). A claim for IAC would be presented to this Court pursuant to a motion under 28 U.S.C. § 2255, and it would require the Court to assess the same arguments and evidence now before the Court. For these reasons, as well as to avoid manifest injustice, the Court will consider the additional declarations submitted by Defendant in support of his motion for reconsideration.

### 2. Legal Framework

As discussed in the Court's prior ruling and noted above, a defendant seeking to challenge a § 1326 charge on the ground that the underlying deportation order was fundamentally unfair must show: (1) that his due process rights were violated by defects in the deportation proceeding; and (2) that such error resulted in prejudice. Ramos, 623 F.3d at 680. In its prior Order, the Court ruled that "based on the record presented, coupled with the Government's acknowledgment of error, the Court is persuaded that Defendant's due process rights were violated as a result of the erroneous information provided by the IJ to Defendant at his removal hearing." Quintanilla, 2010 WL 4922686, at *4. As neither party presently challenges that determination, the sole issue before the Court is whether Defendant's newly-presented evidence is sufficient to establish prejudice.

"If the alien alleges that the IJ's failure to provide information about a form of potentially available discretionary relief caused a due process violation, the alien must show prejudice by establishing that it was plausible that the IJ would have granted such relief." United States v. Cisneros-Resendiz, -- F.3d --, 2011 WL 3890766, at *2 (9th Cir. Sept. 6, 2011). In other words, the alien must "demonstrate that, in light of the factors relevant to the form of relief being sought, and based on the unique circumstances of the alien's own case, it was plausible (not merely conceivable) that the IJ would have exercised his discretion in the alien's favor." Id. (internal quotations, brackets and citation omitted). The defendant-alien bears the burden of making a prima facie showing of prejudice. See United States v. Gonzalez-Valerio, 342 F.3d 1051, 1054 (9th Cir. 2003). If the defendant makes such a showing, "[t]he burden shifts to the government to demonstrate that the procedural violation could not have changed the proceedings' outcome." Id.

### 3. Contentions

Defendant contends that he has plausibly shown that the IJ would have granted him relief from removal through a § 212(h) waiver. See Mot. for Recons. at 10. Under § 212(h), the Attorney General may waive removal if he is satisfied that "the alien's denial of admission would result in extreme hardship to [a] United States citizen or lawfully resident spouse, parent, son, or daughter of such alien." 8 U.S.C. § 1182(h)(1)(B). "Extreme hardship requires great actual or prospective injury or extreme impact on the citizen family member, beyond the common results of deportation." Moriel-Luna, 585 F.3d at 1199 n.5 (citation and internal quotations omitted). The Ninth Circuit has held that it "will find prejudice only after a clear, detailed demonstration that the defendant provided 'non-economic familial support' or 'something more' than financial support." Becerril-Lopez, 541 F.3d at 886 (quoting Arrieta, 224 F.3d at 1082).

Here, Defendant's parents state they could have testified at the 2004 deportation hearing that Defendant provided them with both economic and non-economic familial support. In particular, the parents would have been able to show that Defendant provided them with significant assistance by caring for his two younger brothers. The record shows

- 12 -

that Defendant cared for his brothers while his mother worked, assisted them with homework, ensured that they had dinner, and put them to bed at night. Mother Decl. ¶ 17. Defendant, who is bilingual, also served as his family's primary translator, and his parents generally relied on him to resolve issues with bills, household problems, medical appointments, and meetings with teachers. Id. ¶ 20. He also assisted his father with various jobs and business ventures. Father Decl. ¶¶ 9-12. In addition, Defendant helped support his parents and brothers financially. Id. ¶ 13; Mother Decl. ¶¶ 23-24. Although Defendant moved out of his parents' house in 2001, he maintained a close relationship with his family and continued to support his parents and son. Mother Decl. ¶¶ 6, 18, 35; Second Lopez Decl. ¶¶ 3-4.

Defendant's parents also state they could have testified to the specific personal hardship their son's deportation would cause each of them. First, Defendant's deportation to El Salvador, a country plagued by gang violence, would cause his parents great emotional trauma. Id. ¶ 8-10; Father Decl. ¶¶ 17-18.[4] Second, both parents confirm that they could have testified about the severe sense of personal loss they would feel if their son could no longer be around them. Mother Decl. ¶¶ 6-7; Father Decl. ¶¶ 16-17. Finally, and perhaps most importantly, Defendant's parents state they could have testified about the hardship of raising Caleb, Defendant's son. Mother Decl. ¶¶ 11-16; Father Decl. ¶ 19. Because Caleb's mother could no longer care for him after the Defendant's incarceration, Defendant's parents became Caleb's primary caregivers. In addition to the need to provide childcare and the concomitant impact on their ability to work, Defendant's parents faced hardships associated with Caleb's ongoing upper-respiratory issues and his ADHD.

In this unique combination of circumstances, Defendant's deportation creates two distinct hardships "beyond the common results of deportation" that plausibly could justify relief in the form of a § 212(h) waiver. See Muro-Inclan, 249 F.3d at 1184. Defendant's

---

[4] Defendant's mother was personally aware of the gang violence in El Salvador in 2004. Prior to Defendant's deportation, gang members violently attacked his uncle, who had recently returned to El Salvador from the United States. Mother Decl. ¶ 8.

deportation left Caleb essentially parentless, save occasional vacations or weekends with his mother. See Mother Decl. ¶ 11. Legitimate medical and safety concerns[5] prevented Caleb from moving to El Salvador with his father, and his mother is not able to care for him in the United States. See id. ¶¶ 11-12. Further, Defendant's deportation created both financial and non-financial hardships for his parents. In addition to assuming responsibility for raising Caleb—while already raising their own two children—Defendant's parents also faced the loss of the financial and non-financial support Defendant had provided them in the past. See id. ¶¶ 6, 11-15, 17, 20; Father Decl. ¶¶ 9-13. Caleb's healthcare needs magnified this hardship. See Mother Decl. ¶¶ 11-15.

Based on the new evidence submitted by Defendant in support of his motion for reconsideration, this case is analogous to Arrieta. See 224 F.3d at 1082. In Arrieta, the Ninth Circuit recognized that "[t]he existence of family ties in the United States is the most important factor in determining hardship." Id. The defendant in Arrieta demonstrated that he provided his family with significant financial and non-financial support. Id. He provided an affidavit from his mother to substantiate the critical role he played in raising his younger siblings. Id. His mother also spoke of her poor health and the severe sense of personal loss her son's deportation caused her. Id. Given those facts, the court held that preserving family unity could be the central factor in evaluating extreme hardship, pointing in part to "'[t]he importance and centrality of the family in American life [which] is firmly established both in our traditions and in our jurisprudence.'" Id. (quoting Cerrillo-Perez v. INS, 809 F.2d 1419, 1423 (9th Cir. 1987)).

---

[5] Although the Government challenges whether the Salvadoran government has perpetrated or acquiesced in torture for the purposes of its CAT analysis, it never refutes Defendant's considerable evidence that El Salvador is, in fact, extremely dangerous. See Mother Decl. ¶ 8; Father Decl. ¶¶ 17-18; Second Lopez Decl. ¶¶ 7, 12-17; Mot. for Recons. Ex. E-2; Def.'s First Reply at 11-12, Dkt. 27. In addition to the evidence of gang and police violence that Defendant presents, the Court takes judicial notice of the State Department's 2004 Country Report on Human Rights Practices in El Salvador, available at http://www.state.gov/g/drl/rls/hrrpt/2004/41760.htm, which cites "[a]buse of children, child labor, forced child prostitution, and trafficking in . . . children" as problems facing the country. See Fed. R. Evid. 201(b).

Much like the defendant in Arrieta, Defendant now presents detailed declarations showing that his immediate family members would suffer "something more" than economic hardship as a result of his deportation. See id. ("Unlike in Arce-Hernandez, where we explained that it was not clear whether the alien's family would accompany him back to Mexico, (and did not consider the issue of family separation or emotional and other non-economic familial support,) in this case [defendant] has documented that his deportation would deprive his family of various forms of non-economic familial support and that it would disrupt family unity.").[6] Here, as in Arrieta, Defendant's parents relied on him to help raise his siblings. See 224 F.3d at 1082. They also faced the same severe sense of personal loss that the Arrieta defendant's mother faced. See id. And while Defendant's mother differs from the mother in Arrieta because she did not have health issues prior to her son's deportation, Defendant's deportation forced his parents to raise a young child who has multiple health issues. See id.[7]

The Government's attempts to refute Defendant's familial support argument are unpersuasive. First, the Government challenges the level of support Defendant provided to his family once he moved out of his parents' home, arguing that "he would not have moved out" if his support were integral to the family. Gov's Second Opp'n at 10. The Court is not persuaded that Defendant's significant financial and non-financial support to his parents was dependent upon whether he resided at their home. Indeed, Defendant's mother stated that he came to their home "many nights during the week" to help with his siblings and take

---

[6] Defendant also provides a second declaration from his expert detailing the basis for her opinion that Defendant likely would be granted a § 212(h) waiver based on the hardship to his parents and child. Second Waltermire Decl. at 1-4; see also Muro-Inclan, 249 F.3d at 1186 (finding immigration expert's opinion by itself does not establish plausible grounds for relief but is nevertheless entitled to some weight).

[7] In many ways, the facts here are more compelling than those at issue in Arrieta. Defendant's son faces a parentless upbringing. See Mother Decl. ¶¶ 11-12. Defendant's parents suffer from considerable anxiety knowing that El Salvador is a dangerous place for their son to live. See id. ¶ 8-10; Father Decl. ¶¶ 17-18. Even without these additional circumstances, the Arrieta court held that the defendant in that case made a plausible showing of the requisite non-financial familial support required for a § 212(h) waiver. See 224 F.3d at 1082-83.

care of "whatever was needed," even after he moved out. See Mother Decl. ¶¶ 6, 18. He was also Caleb's primary caregiver. Id. ¶ 35; Second Lopez Decl. ¶¶ 3-4. The Government next argues that Defendant could not have provided significant support to his family after his incarceration in 2002. Gov's Second Opp'n at 10. But Defendant's mother stated that he continued to see and speak to his brothers and son regularly after his incarceration. Mother Decl. ¶¶ 18, 35. He also saw his mother regularly and remained involved in his family members' "everyday lives." Id. ¶ 6. His father stated that Defendant remained his "right-hand man" in his business ventures after his incarceration. Father Decl. ¶ 11.

Despite the Government's assertions to the contrary, the new material facts presented in support of Defendant's motion establish, in a clear and detailed manner, that Defendant provided his family with "something more" than financial support. See Becerril-Lopez, 541 F.3d at 886. He has presented a unique set of facts demonstrating the dual hardship his deportation creates for his son, a United States citizen, and his parents, legal United States residents. After reconsidering Defendant's Motion to Dismiss the Indictment in light of these new material facts, the Court now finds that Defendant has made a plausible showing that he would have been granted relief in the form of a § 212(h) waiver. See United States v. Arce-Hernandez, 163 F.3d 559, 563-64 (9th Cir. 1998) (noting defendant must show prejudice by "tender[ing] a plausible case that he is eligible for a waiver"). The Government has failed to demonstrate that the IJ's error could not have changed the outcome. See Gonzalez-Valerio, 342 F.3d at 1054.[8]

## IV. CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1. Defendant's motion for reconsideration and motion to dismiss the indictment are GRANTED.

2. This Order terminates Docket 45.

---

[8] In light of this determination, the Court does not reach the parties' contentions regarding CAT.

1     IT IS SO ORDERED.

2 Dated: September 27, 2011          _____
                                                          SAUNDRA BROWN ARMSTRONG
                                                          United States District Judge